IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JEREMY RAMIREZ, )
on behalf of himself and a class, )
)
Plaintiff, ) No. 06 C 1875
)
v. ) Honorable Charles R. Norgle
)
APEX FINANCIAL MANAGEMENT, )
LLC, and HILCO RECEIVABLES, LLC, )
)
Defendants. )

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court is Plaintiff Jeremy Ramirez's ("Plaintiff") motion for summary judgment against Defendants Apex Financial Management, LLC ("Apex") and Hilco Receivables, LLC ("Hilco") (collectively, "Defendants"). Also before the Court is Defendants' joint motion for summary judgment against the Plaintiff. For the following reasons, Plaintiff's motion for summary judgment is granted in part and Defendant Apex's motion is denied. The Court reserves ruling on any motions as to Defendant Hilco.

## BACKGROUND

A. FACTS

The following facts are undisputed. The Plaintiff in this case opened an MBNA credit card account on which he later defaulted. After the default, Hilco, a "debt buyer," purchased the account from MBNA. Hilco then outsourced Plaintiff's account to its subsidiary, Apex, to collect any amounts that Plaintiff still owed on the account. To that end, Apex and Plaintiff worked out a payment plan under which the Plaintiff made three installment payments toward his defaulted

account. On November 21, 2005 Apex sent to Plaintiff a letter confirming its receipt of one of Plaintiff's installment payments.

Apex's letter to Plaintiff is signed by, "Apex Financial Management, LLC," and clearly notifies Plaintiff that the letter is "an attempt to collect a debt and any information obtained will be used for that purpose." See Pl.'s Rule 56.1 Statement of Facts, Apex Letter to Jeremy Ramirez, Ex. F. On its face, the letter contains three addresses but fails to direct recipients to send their correspondence, as opposed to payments, to a particular address. Id.; Def.'s Rule 56.1(b) Statement ¶ 27.

The first address is located in the upper-right corner of the page just underneath Apex's letterhead, which is underlined, written in bold type and states, "Apex Financial Management, LLC." Id. Under Apex's letterhead is an address, which reads, "PO Box 2189 ♦ Northbrook IL 60065-2189." Id. Also listed under the letterhead is what appears to be Apex's toll free telephone number and Apex's "hours of operation." Id. The second address is located, likewise, on the upper-right side of the page, approximately one centimeter below Apex's phone number and hours of operation. Id. It reads, "Apex Financial Management, PO Box 2189, Northbrook IL 60065-2189." Id. The third address is located in the letter's upper-left corner, across from the first address. Id. The third address is written in smaller font and is listed underneath a nondescript bar code. Id. It states, "1120 W Lake Cook Rd Ste A, Buffalo Grove IL 60089-1970." Id. Other than the bar code, the third address has no identifiable characteristics. Id.

Apex maintains its principal place of business in Buffalo Grove, Illinois, located in Chicago's Northwest suburbs at the address listed above. See Def.'s Rule 56.1(a) Statement ¶ 2. According to Apex's Senior Vice President of Operations, William Kolz ("Kolz"), Apex maintains a "payment processing lockbox" in Northbrook, Illinois, whose address is listed on the November

21, 2005 letter to Plaintiff, underneath the company's letterhead. See Def.'s Rule 56.1(a) Statement, Ex. 5, Kolz Dep. at 43. The Northbrook office, as the parties refer to it, is simply a payment collection center. When debtors mistakenly send correspondence, as opposed to a payment, to Apex's Northbrook address, Apex has a "[procedure] in place to exchange that mail between offices a couple of times a week." Def.'s Rule 56.1(a) Statement ¶ 20.

Approximately four individuals work in Apex's clerical department. One of their primary tasks is to open mail. Def.'s Rule 56.1(a) Statement, Ex. 5, Kolz Dep. at 25. When handing correspondence, these individuals follow Apex's standard procedures, which vary, depending on the type of correspondence that Apex receives. See Def.'s Rule 56.1(a) Statement ¶ 16. A common correspondence in Apex's business is the cease and desist letter. When a cease and desist letter arrives at Apex, the following steps must be taken immediately: (1) "Stamp document with date;" (2) "Document account with cease and desist specifics;" (3) "Add restrictions [to account] in 'More Info' field;" (4) "Set 15 minute reminder;" (5) "Scan document;" and (6) "Forward to Bill S to decide final status." Def.'s Rule 56.1(a) Statement, Ex. 6, Apex Correspondence Flow Chart. Every step in this process is memorialized in a "flowchart" or "cheat sheet" that is available to Apex's staff. See id.; Def.'s Rule 56.1(a) Statement, Ex. 5, Kolz Dep. at 25. Generally, "whoever opened the mail" would be responsible for completing the first task – date stamping the letter – regardless of the office in which the letter arrived. Id. at 26. But, if the letter was sent to a different address, such as Apex's payment processing center in Northbrook, the letter would be date stamped and sent to Apex's clerical department in Buffalo Grove before any further steps are taken. Id. at 26-27. In Plaintiff's case, the process implemented by Apex took seven days.

On February 9, 2006 Plaintiff sent to Apex a "cease and desist" letter, requesting that Apex cease all communications in regard to his outstanding debt. Pl.'s Rule 56.1 Statement, Ex. D., Ex. 3

3

to Kolz Dep. Plaintiff sent the "cease and desist" letter via certified mail to Apex's processing center in Northbrook, Illinois. Id. The certified mail receipt indicates that Apex received the letter on February 14, 2006. Id.; see Def.'s Answer to Pl.'s Compl. ¶ 21. On that date, Apex's posting supervisor, Beth Scheenweis ("Scheenweis"), who is responsible for posting all payments to Apex's system and sending them to the bank, signed for Plaintiff's "cease and desist" letter at Apex's Northbrook office. Def.'s Rule 56.1(b) Statement ¶ 18. After receiving the letter, Scheenweis, pursuant to Apex's procedure, arranged for the letter's transfer to Apex's Buffalo Grove office. On February 21, 2006, seven days after Apex received the letter at its Northbrook facility, an Apex employee named Kathy Amers, who is stationed in Buffalo Grove, entered Plaintiff's "cease and desist" letter into Apex's computer system. Def.'s Rule 56.1(b) Statement ¶ 23; Def.'s Answer to Pl.'s Compl. ¶ 21. Thereafter, Apex ceased all communications with Plaintiff.

During the seven-day period, Apex had Plaintiff's letter, but before Apex entered it into their system, and while Apex was exchanging mail from its Northbrook office to its Buffalo Grove office, Apex placed twenty-one phone calls to Plaintiff at either his home or his place of employment. See Pl.'s Rule 56.1 Statement, Ex. D, Ex. 1 of Kolz Dep., Ramirez Account History at 8-9. In a detailed report, Apex documents the phone calls that its collectors make to debtors during their attempts to collect on outstanding accounts. That report contains codes and notations that indicate the particular action that the collector took after each call. Id.; see Def.'s Rule 56.1 Statement, Ex. 5, Kolz Dep. at 21-24. For the twenty-one phone calls that Apex made to Plaintiff during the seven-day period, Apex collectors reported that they left messages on Plaintiff's answering machine on several occasions. See Pl.'s Rule 56.1 Statement, Ex. D, Ex. 1 of Kolz Dep., Ramirez Account History at 8-9. On one occasion, a collector assigned to Plaintiff's account made

4

a notation that he or she "also paged" the Plaintiff in addition to making his or her routine phone calls. Id. at 8.

## B. Procedural History

Plaintiff originally filed against the Defendants a three-count class action complaint, alleging a violation of the FDCPA on behalf of himself (Count I), a violation of the FDCPA on behalf of a similarly situated class of individuals (Count II) and a violation of the Illinois Collection Agency Act ("ICAA") (Count III). Plaintiff filed an amended class action complaint on December 11, 2006. Just prior to that, on December 5, 2006 Plaintiff filed his Motion for Class Certification, which became fully briefed on January 26, 2007. Plaintiff thereafter was granted leave to conduct limited financial discovery. After doing so, Plaintiff decided that it would be fruitless to proceed under Count II on a class-wide basis. Accordingly, Plaintiff withdrew his Motion for Class Certification and moved forward with his individual claims.

Plaintiff, individually, has moved for summary judgment on Count I regarding Defendants' alleged violations of the Fair Debt Collection Practices Act ("FDCPA"), which stem from Defendants' contact with Plaintiff after they received his "cease and desist" letter. The motion is fully briefed and before the Court. Once the Court grants summary judgment on Count I in favor of Plaintiff and thereafter determines the Plaintiff's damages, the Court intends to relinquish jurisdiction on Plaintiff's remaining state law claim for violation of the ICAA. See Dargis v. Sheahan, 526 F.3d 981, 990-91 (7th Cir. 2008). Again, the Court reserves ruling on the motion with respect to Plaintiff's federal claims, if any remain, against Defendant Hilco.

5

## II. DISCUSSION

### A. STANDARD OF DECISION

#### *1. Summary Judgment*

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d, 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn the record in the light most favorable to the non-moving party. See Fed. R. Civ. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## 2. Fair Debt Collection Practices Act

The FDCPA is a broad statute designed to "protect consumers from a host of unfair, harassing and deceptive debt collection practices without imposing unnecessary restrictions on ethical debt collectors." Heller v. Graf, 488 F. Supp. 2d 686, 691 (N.D. Ill. 2007) (quoting Blakemore v. Pekay, 895 F.Supp. 972, 977 (N.D. Ill. 1995)). The FDCPA, among other things, prohibits debt collectors from making false representations to consumers and from engaging in abusive or unfair practices when collecting debts. Heintz v. Jenkins, 514 U.S. 291, 292 (1995). The FDCPA says, for example, that debt collectors may not use violence or repeated annoying phone calls in connection with the collection of a debt, 15 U.S.C. § 1692d, and may not use "unfair or unconscionable means to collect" a consumer debt, 15 U.S.C. § 1692f. And for those debt collectors who violate its provisions, the FDCPA imposes civil liability, in favor of the consumers that they mistreat. Heintz, 291 U.S. at 293.

Because the FDCPA is designed to protect consumers, it is liberally construed in favor of consumers to effect its purpose. Ross v. Commercial Fin. Serv., Inc., 31 F. Supp. 2d 1077, 1079 (N.D. Ill. 1999) (citing Cirkot v. Diversified Fin. Sys., Inc., 839 F.Supp. 941 (D. Conn. 1993)). And, in the Seventh Circuit we determine whether a communication or other conduct violates the FDCPA by evaluating a debt collector's conduct through the eyes of the "unsophisticated consumer." See Miller v. Javitch, Block & Rathbone, LLP, 397 F. Supp. 2d 991, 999 (N.D. Ill. 2005) (citing Avila v. Rubin, 84 F.3d 222, 226 (7th Cir. 1996)); see also Gammon v. GC Serv. Ltd. P'ship, 27 F.3d 1254, 1257 (7th Cir. 1994). "The unsophisticated consumer standard protects the consumer who is uninformed, naïve, or trusting, yet it admits an objective element of reasonableness." Miller, 397 F. Supp. 2d at 999. By this admission, the unsophisticated consumer standard also protects the debt collector against liability for unreasonable misinterpretations of its

7

collection notices. Chuway v. Nat'l Action Fin. Serv., Inc., 362 F.3d 944, 949 (7th Cir. 2004) (citing Taylor v. Perrin, Landry, deLaunay & Durand, 103 F.3d 1232, 1236 (5th Cir. 1997)).

## B. A FAILURE TO CEASE AND DESIST

In Count I, Plaintiff claims that Apex violated the FDCPA when it continued to call Plaintiff after having received Plaintiff's "cease and desist" letter. In response, Apex offers two familiar defenses. First, Apex avers that Plaintiff failed to submit sufficient evidence to show that Apex "communicated" with Plaintiff, because Plaintiff failed to show that Apex's phone calls were "regarding the debt," as defined under the statute. Second, Apex maintains that even if it communicated with Plaintiff after having received the "cease and desist" letter, Apex did so only because of a "bona fide error." The Court shall discuss each defense in turn.

### *1. Communication In Connection With Debt Collection*

Plaintiff's first claim hinges on the FDCPA's requirement that debt collectors cease communications with debtors after they receive a debtor's "cease and desist" letter. Specifically, the FDCPA provides:

> If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer **with respect to such debt**, except –
>
> > (1) to advise the consumer that the debt collector's further efforts are being terminated;
> > (2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or
> > (3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.
>
> If such communication is made by mail, notification shall be complete upon receipt.

15 U.S.C. § 1692c(c) [emphasis supplied]. There is no dispute that Apex made phone calls to Plaintiff after it received Plaintiff's "cease and desist" letter. But Apex contends that these phone

8

calls did not qualify as "communications" under the FDCPA because Plaintiff cannot affirmatively and directly establish that Apex's phone calls were regarding the debt.

The FDCPA defines communication as, "the conveying of information regarding the debt directly or *indirectly* to any person through any medium." 15 U.S.C. § 1692a(2) [emphasis supplied]. According to Apex, if its phone calls to Plaintiff did not clearly convey information regarding the debt, then, under a strict reading of the FDCPA, Apex cannot be held liable for its phone calls to Plaintiff.

In support of its position, Apex urges the Court to adopt the reasoning in Biggs v. Credit Collections, Inc., No. CIV-07-0053-F, 2007 WL 4034997 (W.D. Okla. Nov. 15, 2007) and in Francis v. GMAC Mortgage, No. 06-CV-157877-DT, 2007 WL 1648884 (E.D. Mich. June 6, 2007). Respectfully, we decline to do so. First, Francis is easily distinguishable. There, the court considered whether two letters sent to the plaintiff by the defendant debt collector constituted "communications" for purposes of the FDCPA. Francis, 2007 WL 1648884, at *4. One letter was a mere acknowledgement, stating that the defendant received a letter from plaintiff. Id. The other letter was sent in response to an inquiry that the plaintiff initiated. Id. Neither letter had anything to do with the collection of the plaintiff's debt, despite their remote connection. Id. In light of this, the court found that the two letters, on their face, were "in the nature of a customer service response, rather than a debt collection demand." Id.

In this case, however, there is no evidence that Apex, when making its calls, was responding to inquiries or letters sent by Plaintiff. Rather, what the evidence shows is that Apex initiated twenty-one phone calls over the course of seven days. Apex representatives left voice messages requesting that Plaintiff return their calls as soon as possible. Def.'s Reply at 5 n.3. The Plaintiff testified to having recognized one of the representatives as "Cheryl Terry" from Apex, who,

9

according to Plaintiff, was the "primary collector" on his account. Def.'s Rule 56.1(a) Statement, Ex. 3, Ramirez Dep. at 35. These facts remain undisputed. The messages, in essence, conveyed pertinent information to Plaintiff, including the fact that there was a matter that he should attend to and instructions on how to do so. This is, in the very least, an indirect communication regarding the Plaintiff's debt. See Hosseinzadeh v. M.R.S. Assocs., Inc., 387 F. Supp. 2d 1104, 1116 (C.D. Cal. 2005).

In Biggs, the court found that although voice mail messages, in general terms, constitute communication, one should also consider the "words" of the voice mail to determine whether it conveyed information regarding the debt, which would bring it within the statutory definition of "communication." Biggs, 2007 WL 4034997, at *4. To that end, the court reviewed the voice-mail transcripts and found that they did not expressly convey information regarding the debt; thus, they did not constitute "communication." Id. What the court in Biggs failed to consider, however, was Congress's intent in enacting the FDCPA, which calls for a broad construction of its terms in favor of the consumer. Working under this construct, it becomes apparent that messages left on a debtor's answering machine can be considered *indirect* communications regarding the debt, even if the debt collector fails to expressly mention that the call pertains to collection, payment, deadlines or any other observable characteristics of a collection call. Any other interpretation would require a claimant to prove, without exception, that the debt collector conveyed *direct* information about the debt. This is not what the statute calls for, and this is not the first time such a narrow interpretation of the statute has been rejected. See Costa v. Nat'l Action Fin. Serv., No. CIV. S-05-2084, 2007 WL 4526510, at *5 (E.D. Cal. Dec. 19, 2007) ("Although the messages do not mention specific information about plaintiff's debt or the nature of the call, § 1692a(2) applies to information conveyed "directly or *indirectly*."); Belin v. Litton Loan Servicing, LP, No. 8:06 CV 760, 2006 WL

1992410, at *4 (M.D. Fla. July 14, 2006) (rejecting defendants' conveyance argument "because courts have found that messages left on answering machines that did not convey information about a debt were still communications under the FDCPA); Foti v. NCO Fin. Sys., 424 F. Supp. 2d 643, 659 (S.D.N.Y. 2006) (holding that a phone message that "advised the debtor that the matter required immediate attention, and provided a specific number to call to discuss the matter" was a communication, "given the obvious purpose of the message was to provide the debtor with enough information to entice a return call...."); Leyse v. Corporate Collection Serv., Inc., No. 03 Civ. 8491, 2006 WL 2708451, at *6 (S.D.N.Y. Sept. 18, 2006) (argument that messages were not communications because they did not convey information regarding the debt "belies the FDCPA's intent"); Hosseinzadeh, 387 F. Supp. 2d at 1116.

In line with the cases above, this Court declines to adopt the narrow interpretation of "communication" that Biggs put forth. The FDCPA's legislative intent emphasizes the need to construe the statute broadly, so that we may protect consumers against debt collectors' harassing conduct. This intent cannot be underestimated. To adopt Apex's view in this case would be to say that debt collectors can continue calling debtors after having received a "cease and desist" letter, so long as they avoid mentioning the underlying debt, which would absolve them of liability. Such a result would be in grave conflict with the standards that underlie the FDCPA. The Court will tarry no longer on the rulings of other district courts that hold otherwise. The Court therefore finds that Apex's twenty-one phone calls to Plaintiff constitute "communications" under the statute. Defendants' motion for summary judgment is denied on this issue.

### 2. *Bona Fide Error Defense*

In the alternative, Apex asserts that a "bona fide error" caused it to violate the FDCPA. Here, the argument goes that even if Apex communicated with Plaintiff after it received his "cease

and desist" letter, it did so because of a clerical error that occurred during the exchange of mail from Apex's Northbrook office to Apex's Buffalo Grove office. In support, Apex points out that it maintains procedures to protect against communications that violate the FDCPA, but nevertheless the clerical error took place.

Congress built into the FDCPA a defense for debt collectors known as the "bona fide error" defense. Turner v. J.V.D.B. & Assoc., Inc., 318 F. Supp. 2d 681, 683 (N.D. Ill. 2004). If properly asserted, it is an absolute defense to liability for violations of the FDCPA. To establish a bona fide error, a debt collector must show, by a preponderance of the evidence, that "(1) it violated the FDCPA unintentionally, and (2) [it] has in place procedures reasonably adapted to avoid the violation it committed." Id. (citing Jenkins v. Union Corp., 999 F.Supp. 1120, 1141 (N.D. Ill. 1998)). Specifically, the FDCPA states:

> A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. § 1692k(c).

Despite the training that Apex provides to its employees on how to handle "cease and desist" letters, Apex cites a "clerical error" as the reason that its representatives placed twenty-one phone calls to Plaintiff after the "cease and desist" letter arrived at Apex's Northbrook facility. The evidence shows that Apex has a procedure on how to handle "cease and desist" letters once they arrive at the Buffalo Grove office. But the evidence also shows that those procedures are not the same at Apex's Northbrook office. Apex's Senior Vice President of Operations explained that the procedures in place at Apex's Northbrook office require the staff, or whoever opened the mail, to transfer "cease and desist" letters to the Buffalo Grove office for processing. This exchange of mail between Apex's two offices occurred only "a couple times a week," thus leaving open the

12

probability that Apex would continue to call debtors who send "cease and desist" letters to the Northbrook office, while those letters are in transit to Buffalo Grove. And, a debtor who receives a letter from Apex that resembles the letter in this case has a one-in-three chance of sending his "cease and desist" letter to the correct location (as Apex determines correctness) due to the layout of the letter. A few well-chosen informative words in simple language might solve the problem. This is not a "clerical error," but a loose procedure that resulted in a seven day delay in processing and twenty-one collection calls to Plaintiff. What is more, the evidence shows that not even Apex's parent company, Hilco, follows this procedure. If a "cease and desist" letter arrives at Hilco's office, it is immediately faxed to Apex's office in Buffalo Grove so that it can be processed. See Pl.'s Rule 56.1(a) Statement, Ex. 2 to Kolz Dep., Ex. D. There is no such urgency, however, if a "cease and desist" letter arrives in Northbrook, where a transfer of mail occurs only a "couple times a week."

Based on this evidence, the Court finds that Apex's indefinite and unpredictable procedure is not reasonably adapted to avoid violating the FDCPA. On these unique facts, the "bona fide error" defense does not apply. Apex's motion for summary judgment is denied on this issue. Again, it is undisputed that Apex placed phone calls to Plaintiff after it received his "cease and desist" letter. Those phone calls constituted "communication" under the statute. And, since the "bone fide error" defense does not apply, the Court grants summary judgment, in part, in favor of Plaintiff.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted in part. Defendant Apex's motion for summary judgment is denied. The Court reserves ruling on the motions with regard to Defendant Hilco.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATED: 7-28-08